**Affirmed and Memorandum Opinion filed July 7, 2016.**



In The

# Fourteenth Court of Appeals

## NO. 14-16-00071-CV

## IN THE INTEREST OF A.W.G., JR., A CHILD

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2014-06727J**

## M E M O R A N D U M   O P I N I O N

The trial court terminated the parental rights of A.W.G. (Father) and C.C.W. (Mother) with respect to their son, Adam,[1] and appointed appellee Texas Department of Family and Protective Services (the Department) to be Adam's managing conservator. Father raises three issues challenging the sufficiency of the evidence to support the judgment. Mother does not appeal. We affirm.

---

[1] We use fictitious names for the children discussed in this opinion. *See* Tex. R. App. P. 9.8(b)(2).

BACKGROUND

On September 11, 2014, the Department received a referral alleging Mother was under the influence of drugs and was slurring, stumbling, and acting violently while holding Adam, then eight months old. According to the referral, Mother and Father used methamphetamines and marijuana daily. They regularly left Adam with a caregiver, known as "GG," who reportedly used PCP, marijuana, Vicodin, hydrocodone, and Xanax. A month earlier, Adam allegedly grabbed a bag of marijuana off a coffee table. Adam was also said to have been "covered" in bed bug bites a few weeks before the referral and still had some bites. The referral stated Adam's parents failed to provide adequate supervision for him and left him alone for long periods of time.

Department investigator Jennifer Stephens interviewed Mother and Father the next day. Both admitted using drugs in the past but denied using them currently. Ten days later, both parents and Adam's godmother, Heather, were tested for drugs. Mother and Father tested positive for amphetamines and methamphetamines; Father also tested positive for marijuana.[2] Heather tested positive for PCP and marijuana.

The case was transferred to the Department's Family Based Safety Services section on October 16, 2014. The next day, a woman named Christine, who lived in Adam's apartment complex, agreed to serve as the Parental Child Safety Placement, meaning she would take responsibility for Adam while his parents were participating in Department services.

---

[2] The positive results were from a hair follicle test. Each parent's urine was negative for those substances.

Christine kept Adam for two months. She called the Department on December 16, 2014, to say she would be unable to take care of him past December 19.

Department caseworker Tiffany Brown met with Adam's parents and paternal grandmother, Ethel, on December 18 to find an alternate placement for Adam. Ethel offered to take him but said she had no income and depended on her children for money.

During that meeting, Brown noticed Adam had a black eye. Mother and Ethel said Adam got the black eye when he fell into a table while trying to walk. The next day, Department supervisor Stephanie Malek called Christine, who said she believed Adam fell into the table at Ethel's apartment. Brown then went to Ethel's home, located across the street from Adam's apartment complex. Ethel said Adam fell at Christine's apartment.

Brown asked where Adam was at that time, and Ethel said he was with Christine. Brown went across the street to the apartment complex and located Father, who worked in the complex's maintenance department. Father, too, said Adam was with Christine. Brown found Christine getting into her car to leave the complex, but she did not have Adam. Christine said Adam was with his godmother, Heather. Brown, joined by Malek, a deputy sheriff, Father, and Christine, went to Heather's apartment. Heather said Adam was not there and she did not know where he was.

Finally, Adam was found in Mother's apartment, even though Mother was not permitted to be with Adam unless supervised by Christine. When the group entered her apartment, Mother became "very hostile, screaming and yelling" while she was holding Adam and nearly hit his head on a door frame. Mother said she took Adam because she "would take better care of him instead of him being passed

3

around the apartment complex from one drug user to another watching him." When asked about Adam's black eye, Mother said he fell into a coffee table at her apartment. The Department workers informed Mother they were very concerned about the three inconsistent accounts of where Adam hurt himself—Ethel's apartment, Christine's apartment, and Mother's apartment. In response, Mother became more hostile, cursing and repeatedly telling Father that "they are taking our child because of your [expletive] mother."

Though Mother refused to let go of him, Adam was eventually removed from the apartment and placed in foster care. The Department filed its original petition for conservatorship and termination on December 22, 2014.

Trial was held on December 1, 2015. Father orally moved for a continuance before testimony began, contending he had not completed the requirements of his court-ordered family service plan in part due to administrative errors by the Department. The Department responded that Father had ample opportunity to complete the services, and it was in Adam's best interest for the trial to go forward that day. The trial court denied the motion for continuance. The Department presented testimony from a Department caseworker, Father, and Adam's foster father. Father did not call any witnesses. Mother did not appear at trial.

The trial court orally announced its finding that Mother and Father engaged in the conduct described in subsection E of section 161.001(1) of the Family Code. *See* Tex. Fam. Code Ann. § 161.001(1). The trial court further found termination of both parents' parental rights was in Adam's best interest. *Id.* § 161.001(2). The trial court signed a judgment terminating both parents' relationships with Adam and appointing the Department to be his managing conservator. The judgment bases termination on subsections E and O of section 161.001(1), even though the trial court's oral pronouncement was on subsection E only.

4

Father filed a motion for new trial to present new evidence, which was denied. Father timely appealed.

On appeal, Father challenges the sufficiency of the evidence to support each of the trial court's findings. He does not challenge the appointment of the Department as managing conservator.

ANALYSIS

## I.    Burden of Proof and Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *See In re G.M.*, 596 S.W.2d 846, 846 (Tex. 1980); *In re S.R.*, 452 S.W.3d 351, 357 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Although parental rights are of constitutional magnitude, they are not absolute. The child's emotional and physical interests must not be sacrificed merely to preserve the parent's rights. *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of the termination of parental rights, the burden of proof is heightened to the clear and convincing evidence standard. *See* Tex. Fam. Code Ann. § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265–66 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007; *accord J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a heightened standard of review. *S.R.*, 452 S.W.3d at 358.

Parental rights can be terminated upon proof by clear and convincing evidence that (1) the parent has committed an act described in section 161.001(1) of the Texas Family Code, and (2) termination is in the best interest of the child. Tex. Fam. Code Ann. § 161.001. Only one predicate finding under section

5

161.001(1) is necessary to support a decree of termination when there is also a finding that termination is in the child's best interest. *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

In reviewing the legal sufficiency of the evidence in a termination case, we must consider all the evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *See In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009); *J.F.C.*, 96 S.W.3d at 266; *C.H.*, 89 S.W.3d at 25. We assume the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence a reasonable fact finder could have disbelieved. *J.O.A.*, 283 S.W.3d at 344; *J.F.C.*, 96 S.W.3d at 266.

In reviewing termination findings for factual sufficiency of the evidence, we consider and weigh all the evidence, including disputed or conflicting evidence. *See J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (per curiam). The fact finder is the sole arbiter when assessing the credibility and demeanor of witnesses. *Id.* at 109. We are not to "second-guess the trial court's resolution of a factual dispute by relying on evidence that is either disputed, or that the court could easily have rejected as not credible." *In re L.M.I.*, 119 S.W.3d 707, 712 (Tex. 2003).

6

## II. Predicate Ground for Termination: Endangerment

### A. Legal standards

Parental rights may be terminated if a parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code Ann. § 161.001(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996); *S.R.*, 452 S.W.3d at 360.

The evidence must show the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a "course of conduct." *In re S.M.*, 389 S.W.3d 483, 491–92 (Tex. App.—El Paso 2012, no pet.). Although endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738–39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re A.B.*, 412 S.W.3d 588, 599 (Tex. App.—Fort Worth 2013), *aff'd*, 437 S.W.3d 498 (Tex. 2014).

Courts may consider conduct both before and after the Department removed the child from the home. *See Avery*, 963 S.W.2d 550, 553 (Tex. App.—Houston

[1st Dist.] 1997, no writ) (considering persistence of endangering conduct up to time of trial); *In re A.R.M.*, No. 14–13–01039–CV, 2014 WL 1390285, at *7 (Tex. App.—Houston [14th Dist.] Apr. 8, 2014, no pet.) (mem. op.) (considering pattern of criminal behavior and imprisonment through trial).

## B.    Application

### 1.    Drug use

A parent's drug use can qualify as a voluntary, deliberate, and conscious course of conduct endangering the child's well-being. *See S.R.*, 452 S.W.3d at 361; *In re C.A.B.*, 289 S.W.3d 874, 885 (Tex. App.—Houston [14th Dist.] 2009, no pet.). Continued illegal drug use after a child's removal is conduct that jeopardizes parental rights and may be considered as establishing an endangering course of conduct. *S.R.*, 452 S.W.3d at 361–62; *Cervantes–Peterson v. Tex. Dep't of Family & Protective Servs.*, 221 S.W.3d 244, 253–54 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc).

Father was tested for drugs on September 22, 2014, soon after the Department received the referral about Adam's safety. He tested positive by hair follicle for amphetamines, methamphetamines, and marijuana. He was tested again three months later, just after Adam was removed. The amphetamine and methamphetamine levels were both higher than they were on his September drug test, and the marijuana level was lower. That pattern generally continued through February 10, 2015 (all amounts are picograms per milligram [pg/mg]):

|  | Amphetamine | Methamphetamine | Marijuana |
|---|---|---|---|
| September 22, 2014 | 584 | 10,031 | 0.99 |
| December 22, 2014 | 3,758 | 21,752 | 1.0 |

8

| January 8, 2015 | 7,282 | 47,464 | 0.4 |
| February 10, 2015 | 6,779 | More than 50,000 | 0.2 |

Father also tested positive for hydrocodone on February 10, 2015.

These numbers suggest Father continued to take amphetamines and methamphetamines despite the Department's instruction (while the case was in Family Based Safety Services) and a court order (after Adam was removed) not to use drugs. Although Father testified the last time he used those drugs was in January, the test results appear to belie his testimony.

In June 2015, Father's hair follicle tests were negative for amphetamines and marijuana; his methamphetamine level was 2,104 pg/mg. He tested negative for all three substances in September 2015 and thereafter.

## 2. Criminal history

Evidence of criminal conduct, convictions, or imprisonment is relevant to a review of whether a parent engaged in a course of conduct that endangered the well-being of the child. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712–13 (Tex. App.—El Paso 2012, no pet.).

Twenty-eight years old at the time of trial, Father has an extensive criminal history as an adult. The first conviction in the record is from October 2006, when he was 19 years old, for possession of marijuana. In March 2008, he pleaded guilty to possession of a dangerous drug, Carisoprodol. Two months later, he pleaded guilty to unauthorized use of a motor vehicle. He received deferred adjudication community supervision but was adjudicated guilty in January 2009. Father was convicted of reckless driving (speeding through a parking lot) in July 2010. In

9

September 2012 and again in April 2013, he was convicted for two thefts. Finally, in September 2013, he pleaded guilty to evading arrest or detention.

### 3. Conclusion on endangerment

Father has a demonstrated history of substance abuse before Adam was removed. Test results show he continued and increased his use of amphetamines and methamphetamines after removal, despite having been ordered by the court to refrain from using drugs. He also has a lengthy criminal history. Several of his convictions are for drug-related offenses and/or reckless behavior.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Father's parental rights was justified under section 161.001(1)(E) of the Family Code. Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(1)(E). Accordingly, we conclude the evidence is factually sufficient to support the 161.001(1)(E) finding.

In light of our conclusion regarding the trial court's finding on subsection E, we need not make a determination as to its finding on subsection O. *See A.V.*, 113 S.W.3d at 362. We overrule Father's first two issues.

## III. Best interest

In his third issue, Father asserts the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in Adam's best interest. We review the entire record in deciding a challenge to the court's best-interest finding. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013).

10

Termination must be in the child's best interest. Tex. Fam. Code Ann. § 161.001(2). There is a strong presumption that the best interest of a child is served by keeping the child with the child's parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006) (per curiam). Prompt, permanent placement of the child in a safe environment is also presumed to be in the child's best interest. *See* Tex. Fam. Code Ann. § 263.307(a).

Courts may consider the following non-exclusive factors in reviewing the sufficiency of the evidence to support the best-interest finding: the desires of the child; the physical and emotional needs of the child now and in the future; the emotional and physical danger to the child now and in the future; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the child; the plans for the child by the individuals or agency seeking custody; the stability of the home or proposed placement; acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and any excuse for the parent's acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). As noted, this list of factors is not exhaustive, and evidence is not required on all the factors to support a finding that termination is in the child's best interest. *In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

In addition, the Family Code sets out thirteen factors to be considered in evaluating a parent's willingness and ability to provide the child with a safe environment. *See* Tex. Fam. Code Ann. § 263.307(b). Those factors are: (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of

living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child with: (a) minimally adequate health and nutritional care; (b) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (c) guidance and supervision consistent with the child's safety; (d) a safe physical home environment; (e) protection from repeated exposure to violence even though the violence may not be directed at the child; and (f) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. *Id.*; *R.R.*, 209 S.W.3d at 116.

### A. Adam and his foster parents

Department caseworker Marie Youngblood testified about Adam and his foster family:

> It's a nice home, not just physically but environmentally, socially, emotionally as well. They care for him really well. He calls them mom and dad. They are very emotional with him, hugs, kisses. They are very attentive. They make sure he stays up on his medical and

dental. And they go on vacations, things like that. They are caring foster parents.

In addition to Adam, the foster parents have two biological children, ages 9 and 7, and another foster child, an infant. The foster father, David, said the biological children "adore" Adam, and "he is the object of much of their attention. They do very well with him. He calls them Yaya and Bubba. They are very close." The family had vacationed at Disney World a few weeks before trial.

## B. Father

*Endangerment.* The evidence that Father endangered Adam is relevant to the best-interest analysis. *S.R.*, 452 S.W.3d at 366. Abuse of drugs is "hard to escape," and the trial court as fact-finder is "not required to ignore a long history of dependency . . . merely because it abates as trial approaches." *In re M.G.D.*, 108 S.W.3d 508, 513–14 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

*Court-ordered services.* Father moved to another city for several months in 2015, and there was evidence he did so to get away from Mother, who continued to use drugs and was not completing the services necessary to regain custody of Adam. The Department arranged for Father to have a courtesy worker in that city to assist him in completing the services required by the court-ordered family service plan. The record suggests gaps in communication and other logistical mistakes by the Department resulted in Father's not being able to attend required classes and assessments. In the fall of 2015, Father moved back to Houston and completed most of the required services at his own expense. He was still participating in individual therapy at the time of trial; he was reportedly progressing and doing well. The therapist indicated, however, that he was not sure where Father was with his drug problem or in dealing with Adam. The caseworker testified that completion of Father's therapy would depend on the final

13

determinations of the therapist and a substance abuse counselor. On appeal, Father does not challenge the trial court's denial of his motion for continuance. On this record, the trial court reasonably could have found that Father's rehabilitation was not sure to continue. *In re M.G.D.,* 108 S.W.3d at 514 ("[E]vidence of a recent turnaround should be determinative only if it is reasonable to conclude that rehabilitation, once begun, will surely continue.").

***Home environment and employment.*** Father got married a few months before trial. He, his wife, and her two children live in a two-bedroom apartment. He works as the head of the maintenance department for his apartment complex.

***Willingness to parent.*** By all accounts, Adam loves Father and is always happy to see him. Youngblood testified Adam and Father play together during visits. She said Father pays attention to and engages with Adam during the visits and makes sure Adam does not hurt himself. Father sometimes called his wife and stepchildren during a visit so Adam could speak with them. David testified Adam does not experience any problems after returning from a visit with Father.

## C.     Conclusion on best interest

Undisputed evidence shows Adam has flourished in the year he has been in foster care. His foster parents want to adopt him. The record also shows that Father has a stable home and job, is doing well in therapy, has discontinued his drug use since February 2015, and interacts very well with Adam. Still, Father has a history of endangering Adam through continued substance abuse and criminal activity. Although a reasonable fact-finder could look at Father's progress and decide that it justified the risk of keeping him as a parent, we cannot say the trial court acted unreasonably in finding that Adam's best interest lay elsewhere. *In re M.G.D.*, 108 S.W.3d at 514. It is not our role to reweigh the evidence on appeal, and we may not

14

substitute our judgment of Adam's best interest for the considered judgment of the fact-finder. *See id.* at 531 (Frost, J., concurring in judgment).

Having considered the evidence under the applicable standards of review, we conclude the evidence is legally and factually sufficient to support a firm belief or conviction that, as the trial court found, termination of Father's parental rights is in Adam's best interest. We overrule Father's third issue.

## CONCLUSION

We affirm the trial court's judgment.


/s/    J. Brett Busby
          Justice


Panel consists Justices Busby, Donovan, and Wise.